USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/17/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
 :
UNITED STATES OF AMERICA, :
 :
 :  1:18-cr-216-GHW
 -v- :
 :  MEMORANDUM
 :  OPINION AND ORDER
 :
LEOPOLDO ZAMORA GUZMAN, :
 :
 Defendant.:
-------------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

## I. INTRODUCTION

Defendant Leopoldo Zamora Guzman was charged with one count of illegal reentry after having been removed from the United States, in violation of Title 8, United States Code, Section 1326(a) and (b)(1). Pursuant to Section 1326(d) of the statute, a defendant charged with illegal reentry may collaterally attack the underlying removal or deportation order upon which the charge is based. Here, Mr. Guzman challenges the validity of the removal order pursuant to which he was previously removed from the United States, arguing that the immigration judge failed to advise him about his right to seek a form of discretionary relief called "voluntary departure." Because the immigration judge's error constitutes a "fundamental error" under the law of this Circuit, and Mr. Guzman has shown by a preponderance of the evidence that he was prejudiced by that error, his motion to dismiss the indictment is GRANTED.

## II. FACTS

### A. Mr. Guzman's Status and Removal Proceedings

Mr. Guzman is a citizen of Mexico. He does not have legal status in the United States. In June 2009, Mr. Guzman pleaded guilty to two separate charges of aggravated unlicensed operation

of a motor vehicle in New York State court, and was sentenced to ten months of imprisonment. Declaration of Annalisa Mirón, Dkt. No. 12 ("Mirón Decl."), ¶ 7. Mr. Guzman was in custody while those cases were pending.

On October 5, 2009, Mr. Guzman appeared in Oakdale, Louisiana for a removal hearing before Immigration Judge John A. Duck, Jr. *Id.* ¶ 4. With the assistance of a Spanish translator, Judge Duck advised the entire group of illegal entrants to the United States appearing before him regarding a number of their basic rights, including their right to retain counsel, and the right to appeal his decision both to a higher immigration tribunal in Washington, D.C. and, thereafter to a federal court. *Id.*, Ex. B. All of the illegal entrants appearing before Judge Duck—speaking in unison—confirmed that they understood that they had the right to appeal his decision, but that if they failed to do so, and accepted his decision, that the decision would be final.

Significantly for purposes of this motion, Judge Duck never advised Mr. Guzman of his right to seek voluntary departure. He was obligated to do so. *See In Re Cordova*, 22 I. & N. Dec. 966, 970 (B.I.A. 1999). The Government has not presented evidence that would explain or justify that failure. In particular, there is no basis for the Court to conclude that Judge Duck made a conscious determination that Mr. Guzman was ineligible for voluntary removal during or prior to the hearing.

Judge Duck engaged in an individual colloquy with Mr. Guzman, who was then 40 years old. Mr. Guzman was not represented by counsel. Mr. Guzman acknowledged that he was a citizen of Mexico and that he had entered the United States at a location not designated for entry by the United States Attorney General. As a result, Judge Duck found that Mr. Guzman was removable from the United States.

Mr. Guzman told Judge Duck that he was not afraid to return to Mexico, but that he did not know where he would go. As he described to Judge Duck, Mr. Guzman had first entered the United States in 1990. In 1994, he returned to Mexico for five years. He reentered the United States in

November 1999, and had been living in the United States since then. Mr. Guzman's siblings, his wife, and two of his children were living in the United States; his wife and older child, Mr. Guzman said, did not have legal status in the United States, but his youngest child—six years old at the time—was born in New York. Mirón Decl., Ex. B, at 24:26-28:48. According to Mr. Guzman, he had been living in the United States continuously for nearly 10 years.

Judge Duck asked Mr. Guzman "Have you the funds immediately available to pay your passage to Mexico?" *Id.*, at 28:05. And Mr. Guzman responded "No." *Id.* at 28:12. Judge Duck later ordered Mr. Guzman's removal from the United States. After ordering Mr. Guzman's removal, Judge Duck asked Mr. Guzman if he understood the decision, and Mr. Guzman responded affirmatively. When Judge Duck asked "Do you wish to accept my decision or reserve appeal?", Mr. Guzman responded "That's fine, I accept."

Mr. Guzman accepted Judge Duck's decision, but did not accept its result. After Mr. Guzman was removed from the United States, he returned. Indeed, according to the information presented to the Court by the United States during Mr. Guzman's initial bail review hearing, after Mr. Guzman's removal in October 2009, he was removed to Mexico again in January 2013, and yet again just months after in March 2013. Transcript of Bail Review Hearing Before Hon. Debra Freeman, May 4, 2018, Dkt. No 14-1, at 4. Mr. Guzman was not deterred—he again reentered the United States, leading to this case.

### B. Mr. Guzman's Arrest and Indictment[1]

Mr. Guzman was arrested by officers the Department of Homeland Security on February 27, 2018. The officers had learned that Mr. Guzman had illegally reentered the United States, and

---

[1] The facts included in this section of this motion regarding the circumstances of Mr. Guzman's arrest were found by the Court following an evidentiary hearing held in connection with Mr. Guzman's request for bail. Concurring with the pretrial services office, and the conclusions of the Magistrate Judge, the Court determined that Mr. Guzman presented a risk of flight that could not be properly mitigated and ordered that he be remanded pending trial. Dkt. No. 21.

3

had obtained a warrant for his arrest. When the officers confronted Mr. Guzman on the street near Juliana's, the Brooklyn pizzeria where he worked, they identified themselves, telling him "Stop. Police." Mr. Guzman did not stop. Instead he ran, but was apprehended quickly by one of the officers.

Mr. Guzman first appeared in this Court on February 28, 2018. He was held in custody with his consent. The grand jury handed down the indictment in this case on March 13, 2018, charging Mr. Guzman with a violation of Title 8, United States Code, Section 1326(a) and (b)(1). Mr. Guzman filed this motion to dismiss the indictment on May 15, 2018. Dkt. No. 11. In support of his motion, Mr. Guzman submitted an affidavit describing, among other things, his understanding of the immigration proceedings before Judge Duck. Guzman Decl., Dkt. No. 12-3 ("Guzman Decl.").

In his declaration, Mr. Guzman states that while he was provided the assistance of a Spanish language interpreter during the hearing, "the interpreter was speaking very fast and I did not understand everything she said." *Id.* ¶ 5. He also asserted that he was not aware that he had the option to leave the United States voluntarily, and that "If I had known that I could leave voluntarily instead of being deported, I would have chosen to leave voluntarily." *Id.* ¶ 6.

Mr. Guzman also explained his understanding of Judge Duck's question at the hearing: "Have you the funds immediately available to pay your passage to Mexico?" According to Mr. Guzman:

> At the hearing, the judge asked me if I had the funds immediately available to fund my travel to Mexico. I understood the judge to be asking whether I had the money on my person. I remember being confused and thinking "of course I don't have the money on me," as I had been in jail for several months . . . . If the judge had told me that I could have the opportunity to contact my family to ask them to send the money for travel, I would have done that. I am certain my family could have afforded the airplane ticket to Mexico. Before my arrest for the unlicensed driving cases, I had been working as a taxi driver making approximately $700/week.

*Id.* ¶¶ 7-8.

The United States filed its opposition to the motion on June 5, 2018. Dkt. No. 22 ("Opposition"). Mr. Guzman filed his reply a week later, on June 12, 2018. Dkt. No. 23. The Court held a hearing with respect to the motion on June 29, 2018. Neither party elected to present evidence to the Court during the hearing.

### III. ANALYSIS

#### A. Challenges to A Deportation Order Pursuant to 8 U.S.C. § 1326(a)

Under 8 U.S.C. § 1326(a), it is a crime for a deported or removed alien to enter, attempt to enter, or be found in the United States. An alien can defend against this charge by challenging the validity of the deportation order upon which the charge is predicated. *United States v. Gonzalez-Roque*, 301 F.3d 39, 45 (2d Cir. 2002). Congress articulated the circumstances in which an alien can do so in Section 1326(d) of the statute, which provides:

> In a criminal proceeding under this section, an alien may not challenge the validity of the deportation order described in subsection (a)(1) or subsection (b) unless the alien demonstrates that—
> (1)  the alien exhausted any administrative remedies that may have been available to seek relief against the order;
> (2)  the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and
> (3)  the entry of the order was fundamentally unfair.

8 U.S.C. § 1326(d). The plain text of the statutory language makes clear that these "requirements are conjunctive"—a defendant must satisfy all three requirements to succeed in his challenge to a removal order. *United States v. Fernandez-Antonia*, 278 F.3d 150, 157 (2d Cir. 2002). Because the analysis of the first two elements of the statute are informed by its analysis of the third, the Court begins with an analysis of whether Mr. Guzman's removal order was fundamentally unfair.

#### B. Mr. Guzman's Removal Order was Fundamentally Unfair

The United States concedes, as it must, that Judge Duck was required to advise Mr. Guzman of his right to voluntary departure. The Board of Immigration Appeals "has concluded that an

5

immigration judge 'has a duty to inform aliens of potential forms of relief for which they are apparently eligible, including voluntary departure.'" Opposition at 10 (quoting *In Re Cordova*, 22 I. & N. Dec. at 970. Judge Duck failed to do so, and, therefore, committed error. The question is whether that error resulted in the entry of a removal order that was fundamentally unfair.

Mr. Guzman has demonstrated both elements necessary in order for the Court to conclude that his removal order was fundamentally unfair. "To show fundamental unfairness [under Section 1326(d)(3)], a defendant must show both a fundamental procedural error and prejudice resulting from that error. In short, in order to demonstrate prejudice an alien must show that his proceeding contained errors so fundamental that he might have been deported in error." *United States v. Copeland*, 376 F.3d 61, 70 (2d Cir. 2004) (internal quotations and citations omitted) (alteration in original).

The immigration judge's failure to inform Mr. Guzman of the availability of voluntary departure was a fundamental procedural error. As every court to consider this issue in this Circuit has concluded, this result is commanded by the Second Circuit's ruling in *United States v. Copeland*, 376 F.3d 61, 70 (2d Cir. 2004). *See United States v. Gonzalez*, No. 15-cr-0021-JMF, 2015 WL 3443942 (S.D.N.Y. May 29, 2015); *United States v. Garcia*, No. 08-cr-32-ARR, 2008 WL 3890167, at *7–9 (E.D.N.Y. Aug. 19, 2008); *United States v. Tenn*, 888 F. Supp. 2d 213, 231 (D. Conn. 2012); *see also United States v. Brown*, 148 F. Supp. 2d 191, 199 (E.D.N.Y. 2001). The Court agrees with the analysis of those courts, in particular, the thoughtful and comprehensive decision by Judge Furman in *United States v. Gonzalez*. The law applicable to this issue has not changed since the date of Judge Furman's decision. The Court can add little to Judge Furman's decision, and, therefore, points the reader to it for a more thorough treatment of these issues, touching here only on the principal elements of the analysis.

In *United States v. Copeland*, the Second Circuit held that an immigration judge's failure to inform the defendant "of his right to seek discretionary relief was a procedural error sufficient to render the deportation order fundamentally unfair if that failure prejudiced [the defendant]." *Copeland*, 376 F.3d at 75. In its analysis, the Second Circuit recognized that, apart from the Ninth Circuit, all of the other circuit courts that had considered whether the failure by an immigration judge to inform an alien of his right to seek discretionary relief can constitute a fundamental procedural error had answered the question in the negative. *Id.* at 70-71. But in evaluating an immigration judge's failure to inform a defendant of his right to seek relief formerly available under Section 212(c) of the Immigration and Naturalization Act, the Second Circuit concluded that "a denial of an established right to be informed of the possibility of such relief can, if prejudicial, be a fundamental procedural error." *Id.* at 72. The court recognized that relief under Section 212(c) was discretionary and that it was not constitutionally mandated. Nonetheless, the court concluded that, "[i]t does not follow, however, that where an alien is erroneously denied information regarding the right to seek such relief, and the erroneous denial of that information results in a deportation that likely would have been avoided if the alien was properly informed, such error is not fundamentally unfair within the meaning of Section 1326(d)(3)." *Id.* at 71.

Failure to advise an immigrant of the possibility of voluntary departure constitutes fundamental error as described in *Copeland*. Judge Furman's decision in *Gonzalez* aptly explains why *Copeland*'s analysis of the consequences of a failure to inform an alien of the possibility of discretionary relief under former 212(c) applies with equal force in the context of an immigration judge's failure to advise an alien of the possibility of voluntary departure:

> First, although the decision to grant voluntary departure is ultimately discretionary, the right to seek that relief, . . . like § 212(c) relief, is directly conferred by a federal statute that is implemented by federal regulations. Second, as with Section 212(c) relief, applicable regulations require an immigration judge to inform an alien about his or her statutory right to seek voluntary departure—and if the immigration judge fails to do so, the order of removal will be vacated and the matter remanded back to

the immigration judge. Thus, as with § 212(c) relief, the right to be informed of the possibility of voluntary departure relief, although the relief itself is not constitutionally mandated, . . . [is] an established right. Third, just as the Supreme Court had recognized the significance of being able to seek Section 212(c) relief, the Court has acknowledged that voluntary departure is highly beneficial to an alien and . . . often conferred when sought. Finally, and [m]ost significantly, the very serious consequences of deportation militate in favor of treating voluntary departure rights as fundamental [in] nature.

*Gonzalez*, 2015 WL 3443942, at *7 (internal quotations and citations omitted).

The United States' argument against this conclusion relies on decisions from outside of this Circuit, and is, therefore, unpersuasive. For example, the United States points to the Third Circuit's decision in *United States v. Chartwell*, 456 F.3d 347 (3d Cir. 2006), for a definition of what constitutes a fundamental procedural error. Similarly, the United States relies on a district court decision from the Middle District of Alabama to support its argument that voluntary departure should be treated differently than a waiver of deportation. *See* Opposition at 11 (citing *United States v. Perez-Gomez*, No. 13. Cr. 288 (MHT), 2014 WL 6687586 (M.D. Ala. Nov. 26, 2014). And if, like them, this Court were sitting in either the Third or Eleventh Circuit[2], it might agree. However, the Court is bound to apply the law of this Circuit, and, for the reasons outlined above, the Second Circuit's decision in *Copeland* commands the conclusion that an immigration judge's failure to inform an alien of the possibility of voluntary removal for which he is apparently eligible can constitute fundamental procedural error if it was prejudicial.

Mr. Guzman has presented sufficient evidence for the Court to conclude that Judge Duck's error was prejudicial. "Prejudice is shown where 'defects in the deportation proceedings may well have resulted in a deportation that would not otherwise have occurred.'" *Copeland*, 376 F.3d at 73 (quoting *Fernandez-Antonia*, 278 F.3d at 159). "[T]he test for prejudice is the one used to decide ineffective assistance of counsel claims, namely, prejudice is shown where 'there is a reasonable

---

[2] Or, indeed, the Fourth, Fifth, Sixth, Eighth, or Tenth Circuits. *See United States v. Copeland*, 376 F.3d 61, 70 (2d Cir. 2004).

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)); *see also Strickland*, 466 U.S. at 693 (explaining that the required level of prejudice falls between the deficiencies having "some conceivable effect" and "more likely than not alter[ing] the outcome in the case").

"Resolution of the prejudice issue in the Section 1326(d)(3) context is somewhat akin to a trial within a trial." *Copeland*, 376 F.3d at 73. The district court must determine whether there is a reasonable probability that the alien would have obtained relief had he or she been informed of, and sought, voluntary departure. To do so, the district court must first obtain all of the facts relevant to the particular alien and then apply the applicable standards to those facts, "taking into account actual cases in which similarly situated aliens have been granted or denied discretionary relief." *Id.* at 74.

The Court has little difficulty concluding on this record that Mr. Guzman has shown that he was prejudiced by Judge Duck's error. At the outset, the Court notes that the United States presented the Court with no evidence in support of its position, either through affidavits or other evidence presented with its briefing, or through the presentation of evidence at the hearing scheduled by the Court in connection with this motion. As a result, the evidence presented by the defendant in support of his motion is substantially uncontroverted.

Mr. Guzman has established that he would have requested voluntary departure had he been advised of the option. As noted above, in his affidavit, Mr. Guzman asserts that "If the judge had told me that I could have the opportunity to contact my family to ask them to send the money for travel, I would have done that. I am certain my family could have afforded the airplane ticket to Mexico." The United States attempts to rebut these facts presented by Mr. Guzman with a series of speculative hypotheses about why Mr. Guzman might not have requested voluntary departure had he been advised of it. *See, e.g.*, Opposition at 14 ("There is no objective basis to believe the defendant would have sought voluntary departure if advised of it."); *id.* at 15 ("It is also unlikely that

9

the defendant would have sought voluntary departure, because he would have realized little to no benefit from such an application."). But the Government's counterfactual arguments about what Mr. Guzman might have done had he been fully advised regarding the immigration consequences of his choice are not adequate to disturb Mr. Guzman's factual affirmation.

The only factual basis presented for the Court to question Mr. Guzman's assertion that he would have requested voluntary departure is his response to Judge Duck's question: "Have you the funds immediately available to pay your passage to Mexico?" Mr. Guzman answered that he did not. Given the wording of Judge Duck's question, Mr. Guzman's explanation of his answer is credible. Guzman Decl. ¶ 7 ("I understood the judge to be asking whether I had the money on my person. I remember being confused and thinking "of course I don't have the money on me," as I had been in jail for several months . . . .). After all, Judge Duck did not ask whether Mr. Guzman could obtain funding for his travel in a reasonable voluntary departure period to be established. Instead, he asked whether Mr. Guzman had the funds "immediately available."[3] The Court does not have a basis to disturb the factual assertions from Mr. Guzman's affidavit that he would have requested voluntary departure had he been advised of that possibility. Therefore, the Court evaluates whether Judge Duck's error was prejudicial.

To qualify for voluntary departure prior to the conclusion of his removal proceeding, Mr. Guzman was required to meet the eligibility requirements set forth in 8 C.F.R. § 1240.26 and demonstrate that he merited the favorable exercise of the immigration judge's discretion. Neither party disputes that Mr. Guzman was eligible for voluntary departure prior to the conclusion of his

---

[3] It may be that this question from Judge Duck's 2009 script was based on the standard previously applicable to the evaluation of a voluntary departure in a deportation proceeding under the former 8 U.S.C. § 1254(e). *See In re Arguelles–Campos*, 22 I. & N. Dec. 811, 813 (B.I.A. 1999) ("The Immigration Judge stated that in order to demonstrate statutory eligibility for voluntary departure, an alien must show that he is willing to leave the country, *has the immediate means to depart*, and has been a person of good moral character for either 5 or 10 years, depending upon the ground of deportability or removability involved. Such requirements, set out in section 244(e) of the Act, 8 U.S.C. § 1254(e) (1994), are for voluntary departure in deportation proceedings." (emphasis added)).

10

removal proceeding. In particular, Mr. Guzman's convictions for unlicensed operation of a motor vehicle were not "aggravated felonies" that would have made him ineligible for pre-conclusion voluntary departure. *See* 8 C.F.R. § 1240.26(b)(1)(i)(E); 8 U.S.C. § 1101(43).

The question presented, then, relates to the probability that an immigration judge would have granted that form of discretionary relief. Immigration judges have broad discretion to grant voluntary departure. *See Patino v. Holder*, 520 F. App'x 18, 20 (2d Cir. 2013) (citing *In re Arguelles–Campos*, 22 I. & N. Dec. at 819). The Board of Immigration Appeals has described the factors to be considered in connection with the review of such a request as follows:

> [M]any factors may be weighed in exercising discretion with voluntary departure applications, including the nature and underlying circumstances of the deportation ground at issue; additional violations of the immigration laws; the existence, seriousness, and recency of any criminal record; and other evidence of bad character or the undesirability of the applicant as a permanent resident. We further stated that discretion may be favorably exercised in the face of adverse factors where there are compensating elements such as long residence here, close family ties in the United States, or humanitarian needs.

*Id.* at 817.

Given the discretion afforded to immigration judges in cases such as this, the Court concludes that there is a reasonable probability that an immigration judge would have granted Mr. Guzman the opportunity to pursue voluntary departure had he requested it. At the time of the hearing, Mr. Guzman's record presented one prominent adverse factor: he had a recent criminal record.[4] However, his offenses—involving the unlicensed operation of a motor vehicle—did not involve narcotics, violence, or harm to others. Mr. Guzman's criminal conduct, while adverse, would not have barred the availability of voluntary departure on its own. Mr. Guzman presented no other significant adverse factors. At the time of the 2009 hearing, Mr. Guzman had never before been removed from the country—it was the first time that his immigration status had been litigated.

---

[4] There is no evidence before the Court that Judge Duck had information regarding Mr. Guzman's criminal convictions on the date of the 2009 hearing.

11

No evidence has been presented to the Court suggesting that at the time of the hearing Mr. Guzman was of bad character or particularly undesirable, apart from his motor vehicle convictions.

At the same time, Mr. Guzman benefited from a number of positive compensating factors. He had lived in the United States for nearly 14 years—10 continuously prior to the removal hearing. Mr. Guzman's connections to the United States were strong: after his many years in the United States, Mr. Guzman told Judge Duck that he did not know where he would go if he was removed to Mexico. Mr. Guzman had family in the United States, including his wife and children. One of his children was a United States citizen.

Mr. Guzman has presented the Court with a number of decisions by the Board of Immigration Appeals in which immigration judges have exercised their discretion to grant voluntary departure under similar circumstances. *See Matter of M-A-S-*, 24 I. & N. Dec. 762 (B.I.A. 2009); *Matter of Perez-Valle*, 17 I. & N. Dec. 581 (B.I.A. 1980); *In Re: Jimenez*, 2011 WL 4446823, at *1 (B.I.A. Aug. 26, 2011); *In Re: Chia I Lui-Dix*, 2011 WL 1373693 (CHI), at *3 (B.I.A. Mar. 23, 2011); *In Re: Munoz-Alcala*, 2011 WL 4730936 (B.I.A. Sept. 19, 2011); *In Re: Sanabria-Dominguez*, 2010 WL 2601495 (B.I.A. May 25, 2010). Two of the decisions by the Board of Immigration Appeals presented by the United States in support of its position, are arguably distinguishable because they each involve more adverse criminal activity than those presented by Mr. Guzman at the time of his 2009 hearing. *See In Re: Gabriel Sanchez-Rodriguez*, 2017 WL 8785847 (B.I.A. Dec. 6, 2017) (affirming denial of voluntary departure for alien with connections to the United States given convictions for hit and run and drunk driving offenses); *In Re: Alejandro Saldivar-Romo*, 2017 WL 3382693, at *1 (B.I.A. June 15, 2017) (affirming denial of voluntary departure for alien who resided in the United States for 16 years because of drug possession arrests, one of which occurred after placed in removal proceedings).

The Court has reviewed the decisions by the Board of Immigration Appeals referenced by the parties and a substantial number of additional unpublished decisions by the Board. Based on its review, the Court concludes that there was a reasonable probability that Mr. Guzman would have been granted voluntary departure, and that, therefore, Mr. Guzman has demonstrated prejudice. To do so, the Court need not conclude that it is "more likely than not" that an immigration judge would have exercised her discretion to grant Mr. Guzman voluntary departure. Given the broad discretion afforded to immigration judges, a judge might well have exercised his discretion to deny Mr. Guzman voluntary departure on this record. However, given the mix of positive and adverse factors presented in Mr. Guzman's case—considering, in particular, his nature of his limited criminal history at the time—the prospect that an immigration judge would have exercised her discretion to grant voluntary departure is substantially more than conceivable. This is sufficient to demonstrate prejudice.

### C. Exhaustion Obligation Excused; Appeal Waiver Invalid

Mr. Guzman has also satisfied the first and second prongs of the Section 1326(d) analysis: exhaustion and the deprivation of judicial review. Mr. Guzman did not take steps to exhaust his administrative remedies, however, "the exhaustion requirement must be excused where an alien's failure to exhaust results from an invalid waiver of the right to an administrative appeal." *United States v. Sosa*, 387 F.3d 131, 136 (2d Cir. 2004). "A failure to exhaust administrative remedies bars collateral review of a deportation proceeding under Section 1326(d)(1) . . . only where an alien's waiver of administrative review was knowing and intelligent." *Id.* Here, Mr. Guzman's waiver was not knowing and intelligent because he was not informed of his right to seek voluntary departure. *Id.*

Mr. Guzman's failure to appeal the decision of the immigration judge is also excused. "An alien can similarly satisfy the second prong, the deprivation of the opportunity for judicial review, if

13

his waiver of appeal is not knowing." *Gonzalez*, 2015 WL 3443942, at *12 (citing *Copeland*, 376 F.3d at 70); *see also Copeland*, 376 F.3d at 68 n.6 ("Where a waiver of the right to appeal is not knowing, an alien is deprived of the opportunity for judicial review."). Here, because Judge Duck failed to inform Mr. Guzman of his right to voluntary departure—a fundamental error—Mr. Guzman's failure to pursue judicial review of Judge Duck's decision is excused.

## IV. CONCLUSION

For the foregoing reasons, the Court is compelled to conclude that Mr. Guzman has shown by a preponderance of the evidence that entry of his order of deportation was "fundamentally unfair" within the meaning of Section 1326(d). Since Mr. Guzman also meets the other requirements of that Section, the Court finds that the order pursuant to which Mr. Guzman was deported was invalid and that his indictment for illegal reentry after having been deported must be dismissed.[5]

---

[5] During the June 29, 2018 hearing regarding this motion, the United States argued that the Court's consideration of the possible dismissal of the indictment should be informed by a "policy perspective." In particular, the United States stated the following: "If the indictment is dismissed here, the defendant will not receive a new immigration hearing. He will be removed pursuant to the 2009 removal order, effectively making him immune from illegal reentry in the United States." June 29, 2018 Hearing Transcript, Dkt. No. 28, at 18:18-24. The Court questioned the United States why the Government would proceed in that way, given Mr. Guzman's repeated reentries into the United States. Counsel for the United States responded that the question was fair, but that the position of U.S. Immigration and Customs Enforcement was that "essentially there is such a backlog, that he would be in custody for a significant period of time pending a new immigration hearing and there would be resistance to granting it since he already had an immigration hearing. Therefore, it would just be quicker for both the government and the defendant to just deport him pursuant to that removal order." *Id.* at 19:10:21. The Government's position raises several issues worthy of brief comment here. First and foremost, the Court expresses some concern that the Government would be resistant to providing Mr. Guzman with an immigration hearing "since he already had" one, given that the one he already had was marred by what the Court has determined to be fundamental error. Second, the Court is wholly unpersuaded by the policy argument suggested by the United States that the effect of the Court's decision is to make Mr. Guzman effectively immune from illegal reentry. That consequence flows from the conduct of the executive: first, Judge Duck's flawed hearing and resulting removal order, and now, the Government's anticipated renewed removal of Mr. Guzman on the basis of that order. Whether the Government chooses knowingly to remove Mr. Guzman on the basis of a flawed removal order, "effectively making him immune from [a charge of] illegal reentry in the United States," rather than to afford Mr. Guzman a prompt, error-free removal hearing, is a decision that does not rest with the Court. There is also surely some irony in the explanation presented by the prosecutor seeking to imprison Mr. Guzman for an extended period in this criminal case as a result of his alleged illegal reentry: deportation in reliance on the flawed removal order is appropriate, he explains, because otherwise Mr. Guzman "would be in custody for a significant period of time . . . ." *Id.* at 19:11-13.

Accordingly, Mr. Guzman's motion to dismiss the indictment is GRANTED.

SO ORDERED.

Dated: July 17, 2018
New York, New York

_____
GREGORY H. WOODS
United States District Judge